## S94P0668. THORNTON v. THE STATE.
(449 SE2d 98)

SEARS, Justice.

Ronnie Thornton was convicted of the malice murder of Artealia Lavant; three counts of the felony murder of Artealia Lavant, the underlying felonies being two counts of cruelty to children and one count of aggravated battery; and one count of cruelty to children as to Cynthia Lavant. The jury recommended the death penalty for each of the four counts of murder, finding that each murder had been committed during the course of an aggravated battery, OCGA § 17-10-30 (b) (2), and that each murder was wantonly vile, horrible or inhuman in that it involved torture to the victim and depravity of mind. OCGA § 17-10-30 (b) (7). The trial court imposed four death sentences for the murder convictions, and a twenty-year consecutive sentence for the offense of cruelty to children.[1]

Shirley Lavant and her three young children, Cyquieta, Cynthia and Artealia, lived with Ronnie Thornton. Thornton was frequently unemployed, and was the primary caretaker of the children while Lavant worked. On the day of Artealia's death, Lavant returned home after taking Cyquieta to school. She found Thornton standing over Artealia's motionless body. Thornton stated that Artealia, two years old, had choked on pizza and that he had been performing CPR on her. Following a 911 call, paramedics arrived and unsuccessfully attempted to revive the child. Repeated attempts at the hospital to resuscitate Artealia also failed. Hospital personnel noticed that both Artealia and Cynthia, four years old, were covered in bruises, and notified the Department of Family and Children's Services (DFCS). When questioned by a nursing assistant about her bruises, Cynthia stated that "Ron did it." At that time the nursing assistant did not know who "Ron" was, but wrote down Cynthia's statement. Later that day Cynthia gave the same answer to a DFCS employee who questioned her about her bruises. There is nothing in the record to indicate that anyone present influenced Cynthia's statements.

The autopsy performed on Artealia Lavant revealed numerous fresh and old injuries, particularly to her head and face. The child was substantially underweight, and bruises covered her abdomen,

---

[1] The indictment alleged that the crimes occurred on May 7, 1991. Thornton was indicted on May 22, 1991, and reindicted on August 19, 1991. On August 20, 1991, the state filed its notice of intent to seek the death penalty. Thornton's trial began September 21, 1992, and on October 20, 1992 the jury returned its verdict finding him guilty of the crimes charged. The jury's recommendation of death sentences was returned on October 22, 1992, and the trial court imposed sentence on November 10, 1992. Thornton's motion for new trial, filed December 8, 1992, and subsequently amended in August 1993, was denied on November 11, 1993. His appeal was docketed in this court on February 1, 1994. The case was orally argued on May 16, 1994.

chest and back. Additionally, there was an older injury to one arm indicating that the tissues had been repeatedly grabbed and rotated. The doctor who performed the autopsy opined that significant head injuries were the cause of Artealia's death. There was no presence of food in the child's throat or windpipe, and no indication that she died as a result of choking.

A further examination of Cynthia Lavant revealed, in addition to numerous external bruises, that she had untreated, older fractures of her upper arm, wrist bone and ribs. The examining physician testified that it would take a significant amount of force to fracture the ribs in this manner.

Shirley Lavant testified that she began living with Thornton while in the process of divorcing the children's father. She stated that she had repeatedly noticed bruising and other injuries sustained by the children, but that Thornton had always explained that they had fallen or otherwise hurt themselves while playing. Lavant was originally charged with Artealia's murder, but these charges were dismissed, and Lavant was permitted to plead guilty to two counts of cruelty to children.

Lavant's sister-in-law, Jean Wallace, testified that on several occasions prior to Artealia's death she noticed that the child was bruised, swollen and extremely withdrawn. When she confronted Lavant, Lavant stated that Artealia had injured herself playing. Wallace repeatedly contacted Cobb County DFCS seeking an investigation, but none was made.

1. Construing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Thornton guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. (a) Over Thornton's objection the trial court, under the auspices of the Child Hearsay Act, admitted in evidence the videotaped statement of Chuckie Colon, a twelve-year-old relation of the Lavants, who stated that, on two separate occasions, he saw Thornton physically abuse Artealia and Cynthia Lavant. This videotape was made by Jean Wallace and another Lavant relation eight months after one of the alleged incidents occurred and five months after the occurrence of the other. In the videotape Chuckie described watching Thornton slap and strike both victims; jerk their arms; pick up and drop Artealia; and throw Artealia on her bed. After the jury had viewed the videotape, Chuckie took the stand and testified that he was telling the truth when the videotape was made.

Initially, we agree with Thornton that Chuckie's videotaped statement was not admissible under the Child Hearsay Act, OCGA § 24-3-16. That Act provides that

[a] statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse *performed with or on the child by another* is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.

(Emphasis supplied.)

The Act, by its own language, excepts from the hearsay rule "only . . . such statements as are made by the *actual victim of the event being related.*" (Emphasis supplied.) *Assad v. State*, 195 Ga. App. 692, 693 (394 SE2d 617) (1990); *Riddle v. State*, 208 Ga. App. 8, 11 (2) (430 SE2d 153) (1993). ("That statute provides an exception to the hearsay rule only for statements concerning acts of sexual conduct or physical abuse *performed on the child making the statement.*" (Emphasis supplied.))

The cases relied on by the state do not support a conclusion that the out-of-court statements of a child witness who observes the physical abuse of another child, but who is not himself a victim of such abuse, may be admitted as an exception to the hearsay rule under OCGA § 24-3-16.[2]

Contrary to the state's contention, the amendment to OCGA § 24-9-5 governing the competency of certain classes of witnesses excepts "children solely from a competency challenge based on the allegation they do not understand the nature of an oath," *Sizemore v. State*, 262 Ga. 214, 217 (416 SE2d 500) (1992), or the nature of the truth. *Norton v. State*, 263 Ga. 448 (3) (435 SE2d 30) (1993). It does not expand the circumstances under which hearsay statements of a child may be admitted in evidence.

---

[2] In *Rayburn v. State*, 194 Ga. App. 676 (391 SE2d 780) (1990), decided prior to *Assad* and *Riddle*, the child victim's grandmother and a DFCS caseworker testified to statements the victim made regarding acts of sexual abuse. Additionally the grandmother testified in court that she had "observed her granddaughter as being bothered, walking the floor, and not sleeping well . . . ." *Rayburn* at 677. In this context the Court of Appeals noted that the Child Hearsay Act contemplates the in-court testimony of a witness "about what the child victim said and did relevant to the alleged sexual contact." Id. This case does not support the state's proposition that the Child Hearsay Act authorizes admission of the out-of-court observations of a child as to what the victim did relevant to abuse.

In both *Holden v. State*, 187 Ga. App. 597 (2) (370 SE2d 847) (1988), and *Tatum v. State*, 203 Ga. App. 892 (2) (418 SE2d 152) (1992), witnesses testified in court to statements which child victims had made in their presence out of court. That these child victims were not the victims named in the indictment is insignificant as this testimony fell squarely within the parameters of the Child Hearsay Act. *Assad*, supra; *Riddle*, supra.

It does not appear that the issue before us was raised in the final case relied on by the state, *In the Interest of T. M. H.*, 197 Ga. App. 416 (398 SE2d 766) (1990). Accordingly, that case does not stand for the proposition asserted by the state.

The record does not support the state's additional argument that Chuckie's videotaped statement was admissible under the Child Hearsay Act because Chuckie was a victim of mental abuse by Thornton. See OCGA § 16-5-70. While Chuckie stated that he was afraid of Thornton, he also said that the only statement Thornton ever made to him in connection with his observation of the abuse was to "mind [his] own business."

Furthermore, we conclude that Chuckie's videotape was not admissible as a prior consistent statement, see *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985), because no in-court testimony was ever elicited by the state with which the videotape could be consistent and the veracity of which could be attacked.

(b) Thornton argues the trial court erred in admitting videotaped interviews between a sheriff's deputy and Cynthia and Cyquieta Lavant, also under the Child Hearsay Act. Contrary to Thornton's contention, videotaped statements of victims of abuse are not inherently inadmissible under the Child Hearsay Act if the requirements of the statute are otherwise met. *Vick v. State*, 194 Ga. App. 616 (391 SE2d 455) (1990).

In her interview Cyquieta stated that when she left for school on the morning of Artealia's death, Artealia was not sick. She additionally stated that "once in a while" Thornton would pick Artealia up by one arm. Cyquieta also stated that at one point Artealia's arm was swollen and her mother "suspect[ed] it was Ron by picking her up by the arm." Because these statements were observations of the abuse of another rather than statements of abuse suffered by the declarant, the statements were inadmissible under the Child Hearsay Act.

In her videotaped statement Cynthia said that Thornton inflicted the bruises on her face. She also stated that Thornton had hit both Artealia and Cyquieta. While the former statement was admissible under the Child Hearsay Act, the latter was not.

We find that the trial court erred in admitting Cyquieta's videotaped statement, and erred in admitting Cynthia's videotaped statement except to the extent Cynthia described abuse inflicted upon herself.

Due to the erroneous admission of the evidence described above, the appellant's conviction must be reversed. In the remainder of this opinion, we will consider the appellant's remaining enumerations of error and address those issues which potentially could reoccur if the state chooses to retry the appellant.

(c) Cynthia Lavant's statement to a nurse's aide, in response to a question about her bruises, that "Ron did it," was admissible under the Child Hearsay Act. Cynthia was the actual victim of the abuse being related, she was available to testify, and the defense attorney expressly declined the trial court's offer, made outside the presence of

the jury, to call the child to the stand pursuant to *Sosebee v. State*, 257 Ga. 298 (357 SE2d 562) (1987).

(d) There is no requirement in OCGA § 24-3-16 that the state provide the defense with pre-trial notice of its intention to introduce child hearsay statements in evidence. In this case the trial court, in conjunction with Thornton's *Brady* motion, notified the defense three days prior to trial that there was nothing exculpatory in the video-taped interviews with Chuckie Colon and Cynthia Lavant. At the same time the trial court ordered the state to allow defense counsel to view the videotaped interview with Cyquieta Lavant. Additionally, Thornton was able to view the three videotapes during proffers made outside the presence of the jury. At no time did he move for a contin-uance to further explore the issues raised therein. Nor did he cross-examine Chuckie Colon, or invoke the procedures of *Sosebee* to call Cynthia and Cyquieta to the witness stand, even though the record shows that this opportunity was made available to him more than once. We are unable to say under these circumstances that Thorn-ton's right to due process was violated by not being permitted to view all three videotapes prior to trial.

(e) We have previously held that Confrontation Clause concerns addressed in *Idaho v. Wright*, 497 U. S. 805 (110 SC 3139, 111 LE2d 638) (1990), are not present in OCGA § 24-3-16. *Allen v. State*, 263 Ga. 60 (428 SE2d 73) (1993). Thornton's argument that the statute conflicts with the Confrontation Clause lacks merit.

3. (a) Thornton failed to make a hearsay objection to Officer Zachery's testimony regarding his interview with Shirley Lavant and may not raise this issue for the first time on appeal. *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992). Additionally, we note that de-fense counsel cross-examined Detective Zachery extensively about statements Shirley Lavant made during the interview.

(b) Likewise, Thornton specifically stated he had no objection to the playing of the tape-recording of Shirley's 911 call, and may not now complain of its admission.

(c) Upon the trial court's invitation to do so, Thornton stated he had no objection to playing the videotaped interview Deputy Ashcraft conducted with Shirley Lavant. This issue was not preserved for ap-peal. Id.

4. Thornton alleges numerous instances of prosecutorial miscon-duct during closing arguments of the guilt-innocence phase of trial.

(a) Reading the prosecutor's entire closing argument in context, we conclude that the district attorney was not commenting on Thorn-ton's failure to call an expert witness, but was referring to Thornton's failure to rebut evidence that Artealia Lavant was "beaten to death." *Blige v. State*, 263 Ga. 244 (430 SE2d 761) (1993). Additional remarks of the district attorney did not comment on Thornton's failure to tes-

tify, but were assertions that evidence demonstrating guilt had not been contradicted. *Ingram v. State*, 253 Ga. 622 (8) (323 SE2d 801) (1984). The record does not support Thornton's contention that the district attorney attempted to shift the burden from the state to the defense on the issue of malice.

(b) The prosecutor's argument did not assert that the presumption of innocence no longer existed, but rather urged the jury to consider that presumption in the light of evidence presented by the state. We find no error.

(c) There is no merit to Thornton's contention that the prosecutor's argument to the jury that Thornton had acted as "judge, jury and executioner" and had "imposed the death penalty" on Artealia was improper. Moreover, no contemporaneous objection was made. See *Todd v. State*, 261 Ga. 766 (2) (410 SE2d 725) (1991).

Asking the jury to "imagine the pain and suffering" Artealia endured is not reversible error. See *Hammond v. State*, 260 Ga. 591, 597 (5) (398 SE2d 168) (1990). It was not improper for the prosecutor to urge the jury to convict in order to deter child abuse in the community. *Philmore v. State*, 263 Ga. 67 (3) (428 SE2d 329) (1993).

At the beginning of his closing argument, the district attorney noted that defense counsel had never mentioned Artealia Lavant's name. He added that, despite this, Artealia "will never leave here," and "will not leave there for her family." He later queried whether Cynthia Lavant "will ever come out complete of the emotional state she's in." Thornton argues that these are impermissible victim impact statements within the meaning of *Sermons v. State*, 262 Ga. 286 (417 SE2d 144) (1992).[3] The statement regarding Artealia was not impermissible. *Ward v. State*, 262 Ga. 293 (6) (g) (417 SE2d 130) (1992). There was no contemporaneous objection to the statement regarding Cynthia, and even assuming the statement was error, we conclude that there is no reasonable probability that this statement changed the result of the trial. *Todd v. State*, supra.

Likewise, we have reviewed the other alleged instances of prosecutorial misconduct during this argument to which the defense did not object, and we conclude that they did not change the outcome of the trial.

5. Thornton complains that the trial court made seven errors in its charge to the jury following the guilt-innocence phase of trial:

(a) Thornton alleges the charge invited the jury to convict him of murder even if it found that Artealia Lavant died as the result of "accidentally botched CPR" which followed an "unlawful injury"

---

[3] Thornton takes the position that OCGA §§ 17-10-1.1 and 17-10-1.2, which became effective after his case was tried, have no bearing on this issue. See *Livingston v. State*, 264 Ga. 402 (444 SE2d 748) (1994), which upheld the constitutionality of these Code sections.

stemming from child abuse. The trial court gave a legally correct charge on unlawful injury; it did not relate this charge in any manner to Thornton's attempt to perform CPR on Artealia. From our review of the evidence presented and the entire charge, we hold that a reasonable juror would not have inferred that he could find Thornton guilty of murder based on the administering of CPR.

(b) The charge on reasonable doubt of which Thornton now complains is virtually identical to the one he requested. Further, the charge taken as a whole accurately explained the concept of reasonable doubt to the jury, and did not shift the burden of proof to the defense. There is no reasonable likelihood that the jury may have applied this instruction in an unconstitutional manner. *Victor v. Nebraska*, 511 U. S. \_\_\_\_ (114 SC 1239, 127 LE2d 583) (1994).

(c) The trial court's charge on conflicts in evidence is, in substance, the same as the one requested by Thornton. We find no error.

(d) Likewise, the charges on similar transactions and cruelty to children did not differ in any material manner from the charges requested by Thornton, and were correct statements of law.

(e) One count of the indictment charged that Thornton killed Artealia Lavant in the course of an aggravated battery in that he maliciously caused bodily harm to her by "rendering a member of her body useless *and* seriously disfiguring her body." (Emphasis supplied.) In charging the jury on this offense, the trial court correctly defined aggravated battery as "rendering a member of his or her body useless, *or* by seriously disfiguring his or her body or a member thereof." (Emphasis supplied.) OCGA § 16-5-24 (a).

Thornton argues that his conviction is defective because the trial court's charge constituted a fatal variance from the indictment. We disagree. There is no reasonable probability that the trial court's charge permitted the jury to convict Thornton of a crime in a manner not charged in the indictment. *Childs v. State*, 257 Ga. 243 (17) (357 SE2d 48) (1987).

(f) Thornton was charged with three counts of felony murder. The trial court instructed the jury that if it did not find the defendant guilty beyond a reasonable doubt of the counts of felony murder, it was authorized to consider whether he was guilty of the underlying felonies or the lesser included offenses thereof. The law of voluntary manslaughter was not charged, nor was there evidence of this crime present in the case. The charges in question did not violate *Edge v. State*, 261 Ga. 865 (414 SE2d 463) (1992). *Philmore v. State*, 263 Ga. at 69.

6. The jury found Thornton guilty of one count of malice murder and three counts of felony murder for the death of Artealia Lavant. While the evidence is sufficient to support the convictions, see Division 10, infra, the appellant may be sentenced on but one of the con-

victions since there was but a single victim. *Malcolm v. State*, 263 Ga. 369 (434 SE2d 479) (1993); OCGA § 16-1-7.

We do not agree with Thornton's contention that a new sentencing trial must be ordered because the jury imposed four sentences of death based on the four murder convictions. The jury found the aggravating circumstances OCGA §§ 17-10-30 (b) (2) and 17-10-30 (b) (7) as to each of the four murder convictions. While the three death sentences imposed for the felony murder convictions are void under *Malcolm*, this does not affect the validity of the remaining sentence of death. *High v. Zant*, 250 Ga. 693 (18) (300 SE2d 654) (1983).

7. In an extensive order the trial court found that the state's notice of intent to offer evidence of similar transactions was sufficient to place Thornton on notice of the time and place of the alleged occurrences. Further, the trial court found that the state's proffer of four allegedly similar transactions satisfied the test of *Williams v. State*, 261 Ga. 640 (409 SE2d 649) (1991). Both findings are supported by the record. The notice provided by the state in conjunction with the proffer at the *Williams* hearing put Thornton on notice of the similar transactions evidence the state intended to offer at trial such that Thornton had "a meaningful opportunity to rebut that evidence." *Maxwell v. State*, 262 Ga. 73, 74 (414 SE2d 470) (1992).

8. Thornton argues the trial court erred in admitting three statements he made to members of the Douglas County Sheriff's Department which he alleges violated his right against self-incrimination.

(a) Thornton's initial statement was made during the routine investigation of Artealia's death. He indicated that he heard the child coughing and believed she was choking on food. He performed CPR, artificial respiration and attempted to dislodge any objects in her throat with his fingers, but he was unable to revive her. The record supports the trial court's conclusion that Thornton was not in custody at the time of this statement, and *Miranda* warnings were not necessary. *Lobdell v. State*, 256 Ga. 769 (6) (353 SE2d 799) (1987).

(b) With regard to Thornton's second statement, made after a waiver of his *Miranda* rights, the record belies Thornton's contention that it was the product of "veiled threats." Rather, the record shows that the statement, which was videotaped, was made without the "hope of benefit" or "fear of injury." OCGA § 24-3-50.

(c) While incarcerated at the Douglas County jail, Thornton wrote a note asking an investigator to advise him how he could "turn state's evidence." The investigator then conducted a videotaped interview in which Thornton proclaimed his innocence and implicated Shirley Lavant in the crimes. Because no *Miranda* warnings were given to Thornton, the trial court erred in admitting this interview in evidence. That the trial court found Thornton's statements to be voluntary does not make them admissible.

[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Oregon v. Elstad*, 470 U. S. 298, 307 (105 SC 1285, 84 LE2d 222) (1984).

9. Over Thornton's objection, the trial court permitted the state to offer three post-autopsy photographs of Artealia, each depicting injuries to her skull with the scalp deflected. The pathologist who performed the autopsy testified that the autopsy revealed internal bruising all over Artealia's head which was not visible from an external examination. The pathologist further opined that there was a strong likelihood that these injuries, resulting from blunt impact, were the cause of Artealia's death. The photographs in question were cropped to depict only those portions of Artealia's face and skull which illustrated the pathologist's testimony.

We conclude that the admission of these photographs meets the necessity exception to *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983). ("A photograph which depicts the victim after autopsy incisions are made . . . will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy.") See also *Brown v. State*, 262 Ga. 833 (9) (426 SE2d 559) (1993). The photographs were necessary to demonstrate the cause of death and to rebut Thornton's claim that he may have unintentionally killed the child while performing cardiopulmonary resuscitation on her after she choked on a piece of food.

10. Contrary to Thornton's assertion, the record shows that he consented in writing to a search of his home. He points to nothing in the record demonstrating that this consent was not voluntarily given.

11. Thornton argues the trial court erred in permitting two physicians to testify to "an ultimate issue" in the case: that Artealia was an abused child.

The emergency room physician who treated Artealia on the morning of her death testified that his examination of the child revealed "multiple contusions all over the body which were . . . old in nature so there was a strong suspicion of child abuse." The pathologist who performed the autopsy testified that Artealia had suffered an injury to her arm indicating that the tissues had been "grabbed and rotated." He testified that this rotation of tissues tears the blood vessels, causing bleeding which turns into bulk if not absorbed and is one of the "signs you look for . . . in suspected child abuse cases."

These experts did not give their professional opinions that

Artealia had been abused, but only that there was a "suspicion" of child abuse. After denying Thornton's motion for mistrial based on this testimony, the trial court instructed the jury that "regardless of the possible words 'child abuse' by a witness in this case, that determination always remains for you the jury to decide." Further, defense counsel twice maintained in his opening statement to the jury that "the medical evidence" would show that "someone hit those children over some period of time," and that the questions to be answered were who had done it and when it had been done. Last, some of the inferences to be drawn from the medical testimony in question were beyond the ken of the average jurors. *Allison v. State*, 256 Ga. 851 (3) (353 SE2d 805) (1987); *Bethea v. State*, 251 Ga. 328 (10) (304 SE2d 713) (1983). Considering all these circumstances we find no error.

12. Thornton argues the trial court erred in denying his motion to require Cynthia and Cyquieta Lavant to submit to an interview concerning events surrounding their sister's death. At the hearing on this issue, both DFCS, who had legal custody of the girls, and the guardian ad litem appointed for the children opined that neither the state nor Thornton should be permitted to interview the children. As "[a] witness may refuse to be interviewed prior to trial," *Dover v. State*, 250 Ga. 209 (2) (296 SE2d 710) (1982), and a child-witness' guardian may make such a decision, id., the trial court did not err in denying Thornton's motion. The videotaped interviews with the children were made by the Douglas County Sheriff's Office shortly after the murder in the legal investigation of Artealia's death. The record does not support Thornton's claim that the interviews were made to give the state unfair access to the children.

13. In enumerations of error 13, 15, and 17, Thornton argues that the trial court committed numerous errors in conducting voir dire, and in failing to excuse several jurors for cause.

(a) Contrary to Thornton's assertion, potential juror Carter did not state that all murderers, save those who act in self-defense, should receive the death penalty. The trial court correctly sustained objections to many of Thornton's questions as they either asked potential jurors to prejudge the case or to outline the type of case in which a death sentence should or should not be imposed. *Blankenship v. State*, 258 Ga. 43 (6) (365 SE2d 265) (1988).

The record does not bear out Thornton's claim that the state was permitted to ask a potential juror about what type of evidence would be sufficient to justify the death penalty; rather, the record shows the state merely asked the juror to clarify what she meant, in her response to a defense question, by an "aggravated" murder. Further, Thornton did not object to this question or other questions of which he now complains. Absent a contemporaneous objection, the issue is not preserved for appeal. *Pope v. State*, 256 Ga. 195 (7) (c) (345 SE2d

831) (1986).

(b) Thornton maintains the trial court erred in failing to excuse 12 jurors for cause. The responses of potential jurors Samples, Britain, Strickland, Thomas, and Brown were, to varying degrees, equivocal regarding their beliefs about the death penalty and whether they would favor it over a sentence of life imprisonment. However, the record supports the trial court's findings that each juror in question was capable of serving impartially, and would consider both the evidence in mitigation and the trial court's instructions in determining the appropriate sentence. "These findings are entitled to deference from this court." *Ledford v. State*, 264 Ga. 60 (6) (b) (439 SE2d 917) (1994).

Defense counsel argue that potential jurors Smith and Arrington should have been dismissed for cause because they indicated to a bailiff that they were frightened by the fact that Thornton was "grinning" at them. Both women were thoroughly questioned by the trial court and stated that, while they were surprised and made "uncomfortable" by Thornton's behavior, it would not affect their abilities to be fair and impartial jurors, and would have no effect on any decision they might make in the case. We find no error in failing to excuse them for cause.

Thornton has failed to show that the tenuous relationships between potential jurors Blackman and Rainwater and the district attorney constituted sufficient grounds to strike them for cause, and the trial court did not err in failing to do so. Likewise, the record does not support Thornton's contention that the three remaining jurors challenged held opinions so fixed that they were unable to set them aside and decide the case based on the evidence and the court's charge. *Johnson v. State*, 262 Ga. 652 (2) (424 SE2d 271) (1993).

(c) Thornton alleges that many of the prosecutor's questions during voir dire were improper, and tainted the jury. There was no contemporaneous objection to any of these questions. *Earnest v. State*, supra. Further, the record does not support Thornton's contention that the prosecutor denigrated the significance of mitigating evidence. Considering the entire voir dire, rather than isolated extracts, it is apparent that the questions asked were sufficient to permit the discovery of bias or prejudice held by any prospective juror. *Curry v. State*, 255 Ga. 215 (2) (b) (336 SE2d 762) (1985).

14. The trial court did not abuse its discretion in denying Thornton's request to sever the charge of cruelty to children involving Cynthia Lavant from the charges against him involving Artealia Lavant. The record shows that the similar offenses, resulting in injuries to Cynthia and death to Artealia, occurred over the same period of time, and were based on the defendant's continuing conduct as the children's caretaker and disciplinarian. *Terry v. State*, 259 Ga. 165,

168 (377 SE2d 837) (1989).

15. Thornton maintains the trial court erred in failing to require the district attorney to disclose any associations between his office and prospective jurors in the case. Considering that Thornton was permitted to submit an extensive pre-trial questionnaire to prospective jurors, and allowed unlimited voir dire on this issue, we find no error.

During a pre-trial hearing counsel for Thornton conceded that the state had provided him with its entire files from DFCS offices in Cobb, Douglas and DeKalb Counties regarding this case. He may not now complain that these files were not provided to him.

16. Thornton argues that the trial court erred in requiring his experts to reduce their findings to written reports and provide these to the state pursuant to *Sabel v. State*, 248 Ga. 10 (282 SE2d 61) (1981) and OCGA § 17-7-211 when there was no showing that Thornton intended to introduce either of these reports at trial. We agree.

We held in *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994), that with regard to scientific reports, "the state is entitled to only those discovery rights specifically granted to the defendant by OCGA § 17-7-211." Id. at 325. We pointed out that, consistent with discovery rights granted the defendant, the state may discover only those written reports generated by defense experts which the defense intends to introduce at trial. We overruled *Sabel* to the extent it conflicted with this holding. Although *Rower* was decided after Thornton's case was tried, Thornton's appeal was "in the pipeline," see *Taylor v. State*, 262 Ga. 584 (2) (b) (422 SE2d 430) (1992), and, thus, the *Rower* rule applies to Thornton's appeal, id., and there was error.

17. Because the trial court correctly concluded that Thornton did not make "a substantive showing of the likelihood of prejudice by reason of extensive publicity," it did not err in denying Thornton's motion for change of venue. *Jones v. State*, 261 Ga. 665, 666 (409 SE2d 642) (1991). Over half of the venire members had neither heard nor read anything about the case. The vast majority of those who had been exposed to pre-trial publicity could remember nothing about it. Of those who had been exposed to pre-trial publicity, only one person stated that she had formed an opinion about the defendant as a result, and she was excused for cause.

18. The record belies Thornton's claim that he was denied a right to a speedy trial. There are two terms of court in Douglas County, commencing in April and in October. Thornton was initially indicted in May 1991, during the April term, and he filed a demand for speedy trial in that same term. The grand jury subsequently re-indicted Thornton, and he was brought to trial in September 1992, within two terms of court after the term in which his demand for speedy trial was made. OCGA § 17-7-171 (b). Further, the record shows that

Thornton, after consultation with counsel, withdrew his demand for speedy trial in open court.

19. Prior to trial, the trial court excused from service eight college students who were registered and attending classes or scheduled to begin classes during or around the week the trial was to begin. Thornton contends that these were qualified jurors, that there was no valid reason to excuse them, and that their elimination violated his right to a jury drawn from a fair cross-section of the community.

In Georgia, there is no statutory exemption from jury duty for college students. See OCGA § 15-12-1. However, § 15-12-1 permits a trial court to excuse a juror from service if the juror shows "good cause why he [or she] should be exempt from jury duty," § 15-12-1 (a). Thus, while a blanket, indiscriminate excusal of registered college students is incompatible with Georgia law and with the need to draw juries from a fair cross-section of the community, a trial court has the discretion, as with other potential jurors who request to be excused from service, to excuse a student from jury duty based on a determination that service would impose a special and undue hardship on the individual student. In ruling on a student's request for excusal, a trial court should consider the student's obligations, the length of the trial, and other factors or circumstances relevant to the individual's request. Likewise, a trial court may refuse a student's request for excusal based on those same considerations.[4] See, e.g., *Robinson v. State*, 180 Ga. App. 248, 249 (348 SE2d 761) (1986) (court affirmed trial court's refusal to excuse student from service in two-day trial which began on Monday and ended on Tuesday, where student had exams on Wednesday and Friday of the same week). The record in this case shows that the trial court interviewed each student individually, and that the anticipated duration of the particular trial for which the jurors were summoned, which lasted one month, played a significant part in the trial court's decisions on requests for excusal. Therefore, we find no error.

20. Thornton argues that his indictment should have been quashed because Thomas Furr, a medic who rendered aid to Artealia Lavant just before her death, served on the grand jury which indicted him. Furr did not testify at trial.

Trial counsel in this case was not appointed until after Thorn-

---

[4] This Court has held that "the pre-trial excusal of four prospective jurors who were college students enrolled in schools outside the county" was not error under § 15-12-1 (a). *Hall v. State*, 261 Ga. 778 (3) (415 SE2d 158) (1991). It is not clear from the language of *Hall* whether the students were excused, and their excusal affirmed, solely because of their status as students, or because the fact that they attended college outside the county would work a particular and individual hardship on them, as opposed to college students who attended college within the county. To the extent *Hall* would authorize the blanket excusal of students based solely on their status as students, it will not be followed.

ton's indictment. Thornton's counsel conceded below that he became aware of Furr's participation in the case at least six months prior to trial, and that he possessed a list of the grand jury members. His challenge to the indictment, made during voir dire, is untimely. *Sowers v. State*, 194 Ga. App. 205 (2) (390 SE2d 110) (1990). Further, Thornton has failed to show bias resulting from Furr's presence on the grand jury, or that if bias were shown, it would entitle him to a dismissal of the indictment. Id.

21. The record does not support Thornton's claim that placing additional African-Americans and females on the jury lists in order to mirror the representation of these groups in Douglas County's population resulted in the underrepresentation of white males on the grand jury and petit jury lists.

22. Thornton maintains the trial court erred in permitting the state to offer inadmissible non-statutory aggravating circumstances during the sentencing phase of trial.

(a) Initially Thornton argues that the state provided inadequate notice of the non-statutory aggravating circumstances it intended to offer during sentencing. Thornton does not claim that the notice was not timely provided under OCGA § 17-10-2, but maintains that his sentencing trial was rendered fundamentally unfair by the state's failure to provide dates and places where the alleged conduct took place.

We conclude that the state provided adequate notice of its intent to offer evidence of an incident in which Thornton allegedly pointed a gun at one Rod Johnson. While the notice did not provide a specific date, the incident was described with sufficient particularity to place Thornton on notice of when the incident occurred.

The notice as to allegations of drug use and sales presents another matter. The state notified Thornton only that it intended to "offer evidence that Ronnie Thornton used, sold and distributed illegal drugs." At the sentencing phase the state offered the testimony of Joe Harper, a federal prisoner convicted of drug trafficking. Harper testified that he observed Thornton using drugs "a lot of times," and that, additionally, he had been with Thornton when he sold crack cocaine. Harper's testimony was unspecific as to dates and places.

It is permissible for the state to offer evidence of unproven criminal charges during the sentencing phase of a death penalty trial where the state timely notifies the defendant of its intention to do so. *Jefferson v. State*, 256 Ga. 921 (8) (a) (353 SE2d 468) (1987); *Ross v. State*, 254 Ga. 22 (5) (a) (326 SE2d 194) (1985). We hold, however, that notice of unproven criminal charges must be described with enough particularity to alert the accused to what he must defend against. The state failed to do that in this case. The notice provided the defendant made reference to no incident or period of time in which the state would attempt to show unproven, drug-related activ-

ity. We note that notice of the state's intention to prove prior convictions must be specific. See, e.g., *Wright v. State*, 255 Ga. 109 (7) (335 SE2d 857) (1985). Notice of prior criminal activity for which there is no conviction should be given equal deference.

(b) The trial court conducted a hearing out of the presence of the jury to determine whether the testimony of a number of witnesses, relating to non-statutory aggravating circumstances, was reliable. The record supports the trial court's findings of reliability.

(c) Thornton has failed to demonstrate how his First Amendment rights were violated by the admission of his statement referring to Artealia Lavant as "that bitch's baby."

23. Thornton argues the trial court committed numerous errors in its charge following the sentencing phase of trial.

(a) Thornton maintains the trial court erred in not charging the jury that to find OCGA § 17-10-30 (b) (2) as an aggravating circumstance, it must find that Thornton was engaged in the commission of an aggravated battery at the time the homicide occurred. While we do not agree that the trial court's charge invited the jury to find an aggravated battery based on injuries which were not contemporaneous with the murder, we note that the jury found that the "murder . . . was committed *while the offender was engaged in an aggravated battery of the victim prior to the death of the victim.*" (Emphasis supplied.) It is thus clear that the jury was not misled by the trial court's charge. Likewise, we conclude that the trial court's slip of the tongue in instructing the jury that to find an aggravated battery it must find that the defendant deprived the victim of a "part" of her body, rather than a "member" of her body, did not permit the jury to find this aggravating circumstance on less than is required by law. See *Baker v. State*, 245 Ga. 657 (6) (266 SE2d 477) (1980). As the trial court charged the intent element of aggravated battery requested by the defense and the charge was a correct statement of the law, we find no error.

(b) Thornton did not request the trial court to charge that the (b) (7) aggravating circumstance must have occurred contemporaneously with the murder. The trial court's charge was a correct statement of the law. The jury found that the "murder . . . involved torture to the victim and depravity of mind." Nothing in the trial court's charge suggested that the jury could find the depravity of mind element based on Thornton's efforts to perform CPR on the victim.

(c) The trial court's instruction on nonstatutory aggravating circumstances was not error. The trial court did not err in refusing to charge the jury that it could not consider nonstatutory aggravating factors. *Lee v. State*, 258 Ga. 82 (7) (365 SE2d 99) (1988); *Zant v. Stephens*, 250 Ga. 97, 100 (297 SE2d 1) (1982). The trial court did properly instruct the jury that it could not impose the death penalty

unless it found the existence, beyond a reasonable doubt, of at least one statutory aggravating circumstance.

(d) During deliberations the jury sent the trial court a note stating that it needed "clarification of the Georgia law pertaining to life in the penitentiary." The trial court asked the jury to "restate" its question, and "elaborate a bit so I can tell exactly what you're asking." The jury retired and subsequently sent a note to the court stating that it withdrew its previous request. Under these circumstances, the trial court did not err in failing to charge the jury that a life sentence meant that Thornton would spend the rest of his natural life in prison. *Jones v. State*, 263 Ga. 904 (1) (440 SE2d 161) (1994). Compare *Simmons v. South Carolina*, 62 USLW 4509 (decided June 17, 1994).

(e) The trial court's charge did not ask the jury to "weigh" the (b) (2) and (b) (7) aggravating circumstances. Nor did the trial court's charge invite the jury to weigh the torture and depravity of mind elements of aggravating circumstance (b) (7). Aggravating circumstances are not invalid simply because they may overlap to some degree. *Castell v. State*, 250 Ga. 776 (17) (301 SE2d 234) (1983).

(f) The trial court was not required to instruct the jury to consider the specific mitigating circumstances requested by Thornton. *Taylor v. State*, 261 Ga. 287 (11) (404 SE2d 255) (1991).

(g) The trial court did not err in instructing the jury that it could "recommend" the death penalty when it was clear from the charge that the recommendation would be binding on the trial court. *Holiday v. State*, 258 Ga. 393 (19) (a) (369 SE2d 241) (1988).

(h) Thornton maintains the trial court erred in refusing to charge the jury that it could impose a life sentence based solely on mercy. The trial court's instructions satisfied the requirement under Georgia law that the jury be informed it can consider all evidence presented in both phases of trial; that the jury be instructed to consider mitigating circumstances; and that the jury be informed that it can recommend a life sentence even if it should find one or more statutory circumstances beyond a reasonable doubt. *Ross v. State*, 254 Ga., supra at (6). We find no error.

(i) The trial court did not err in failing to charge the law requiring corroboration of an accomplice's testimony, absent a request to do so. *McCorquodale v. State*, 233 Ga. 369 (2) (211 SE2d 577) (1974).

24. Thornton complains of a number of instances of alleged prosecutorial misconduct during the state's closing argument following the sentencing phase of trial. However, in only one of these instances did Thornton make a contemporaneous objection.[5] We have

---

[5] Thornton argues that he preserved these issues for appeal by filing a pre-trial motion

reviewed the allegations to which no objection was made and conclude that there is no reasonable probability that any improper argument changed the result of the trial. *Todd v. State*, 261 Ga., supra at (2) (a).

The one instance in which a contemporaneous objection was made involved the district attorney's statement that he expected Thornton's relatives to beg the jury "to not give what is justice in this case," but that "no one will get to come in here and beg for Artealia." Thornton objected to this statement on the ground that it constituted impermissible victim impact evidence under *Sermons v. State*, supra. We conclude that the district attorney's argument was not victim impact evidence, and that these limited remarks did not unduly prejudice Thornton.

25. The state provided evidence sufficient for a rational trier of fact to find that Thornton intended to kill Artealia Lavant. See Division 10, supra.

The evidence is sufficient to support both the jury's finding that an aggravated battery occurred, *In the Interest of H. S.*, 199 Ga. App. 481 (405 SE2d 323) (1991); *Thompson v. State*, 156 Ga. App. 1 (273 SE2d 894) (1980), and that the offense of murder was committed while Thornton was engaged in the commission of this aggravated battery. OCGA § 17-10-30 (b) (2). Further, the evidence shows a continuing pattern of abuse which culminated in the fatal injuries inflicted on the child and supports the jury's finding of the (b) (7) aggravating circumstance. *Hall v. State*, 261 Ga. 778 (11) (415 SE2d 158) (1991).

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 31, 1994.

*Kenneth W. Krontz, Elizabeth A. Geoffroy, Barry J. Fisher*, for appellant.

*David McDade, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Matthew P. Stone, Rachelle L. Strausner, Assistant Attorneys General*, for appellee.

---

in limine seeking to prevent the state from making certain arguments. The record does not show that the trial court ever ruled on this motion. In this circumstance the motion will not suffice for a contemporaneous objection which would have permitted the trial court to take remedial action to correct alleged errors of which Thornton now complains.