S08A2056. CHARACTER v. THE STATE.
S08A2057. ROBERTS v. THE STATE.
(674 SE2d 280)

SEARS, Chief Justice.

The appellants, Gerard Character and Terrence Roberts, appeal from their convictions for numerous crimes, including the murder of Jerry Lovejoy and Leonard Justice and the aggravated assault of Joseph Tharpe, stemming from an incident at the Poole Palace nightclub on February 10, 2002. Gerard's brother, Marcus Character, was also convicted of the foregoing murders and aggravated assault, but his appeal was dismissed as untimely.[1] On appeal, the appellants both contend that the trial court erred in admitting prior difficulty evidence between Lovejoy and the Characters and that the evidence is insufficient to support their convictions. Character and Roberts also each raise issues that apply only to their individual appeals. We conclude, however, that the contentions raised by Character and Roberts are without merit, and we thus affirm their convictions.

---

[1] The crimes occurred on February 10, 2002. Roberts and Gerard Character were indicted on April 11, 2003, and on May 7, 2003, both were convicted of malice murder for the shooting of Lovejoy and Justice; aggravated assault stemming from the shooting of Tharpe; and the possession of a firearm during the commission of a felony. Gerard was also convicted of the possession of a firearm by a convicted felon. Roberts and Gerard were given two concurrent life sentences for the malice murder convictions, 20-year concurrent sentences for aggravated assault, and five-year consecutive sentences for the possession of a firearm during the commission of a felony. Gerard was given a five-year concurrent sentence for the possession of a firearm by a convicted felon. On May 13, 2003, Roberts and Gerard filed motions for new trial, and on April 20, 2007, the trial court denied both motions. Gerard and Roberts filed notices of appeal on April 23 and 25, 2007, respectively. The appeals were docketed in this Court on August 19, 2008, and the cases were subsequently submitted for decision on the briefs.

1. At trial, the trial court permitted Tharpe to testify under the necessity exception to the hearsay rule about a prior difficulty between Lovejoy and the Characters. Tharpe testified that Lovejoy told him that, a couple of weeks before the shooting, he was playing a dice game with the Characters and won about $3,000 to $4,000. When Lovejoy finished playing and was walking away from the game, the Characters pulled guns on him and took the money back. Lovejoy told Tharpe of this incident on the day that it happened, and Lovejoy was mad about the robbery, wanted revenge, and told Tharpe he wanted to kill the Characters. Tharpe told Lovejoy to calm down and not to place his freedom and time with his children in jeopardy. According to Tharpe, Lovejoy agreed with him and "cooled off" about it.

In addition to testifying about the prior difficulty, Tharpe testified that on the night of the crimes he went to the Poole Palace with Lovejoy, Justice, Anthony Gates, and Lacario White. Tharpe was best friends with Lovejoy, whom he had known for 15 years, and he had known Justice all his life and was close friends with him as well. The Characters and Roberts were also at the club, and Tharpe knew all the defendants. While at the club, Tharpe spoke with Quita Brown, who was romantically involved with Roberts. Gerard Character approached Tharpe and tried to intimidate him and start an argument. Tharpe brushed off Gerard's behavior, and shortly thereafter, Gerard, Marcus, and Roberts left the club. About 30-45 minutes later, when the club was closing, Tharpe, Lovejoy, Justice, and White left the club together. Tharpe testified that the Characters, Roberts, and about ten of their friends blocked the path from the front steps of the club so that Tharpe and his friends could not walk through. Tharpe asked the group why they would not let them pass, and Gerard starting cursing at him. At that point, a person with the defendants' group named Terry hit White in the mouth, and, in response, Tharpe and White began hitting Terry. Tharpe then heard several shots and was struck by a bullet in his lower back. Tharpe turned around and saw Gerard pointing a gun at him. Tharpe grabbed the gun, and although he was shot in the hand, he took the gun from Gerard. After Tharpe chased off Gerard, he saw Marcus Character fire numerous shots, and he saw Roberts holding a gun and standing over someone on the ground. That person was Justice, who had been shot in the head and died from his injuries. After the shooting, Tharpe gave the gun he took from Gerard to the police, and it was identified as a .45 caliber Astra handgun.

Anthony Gates testified he saw Gerard become upset with Tharpe after Tharpe spoke with Brown, who, at that time, was dating Roberts. Gates did not leave the club with Tharpe and his group, but he left about the same time they did. When he was outside

the club, he heard gunshots, saw Marcus Character shoot "through the crowd," and saw Lovejoy "drop dead." Gates was about ten feet from Marcus when he fired the shots. An autopsy revealed that Lovejoy had been shot in the back and died from internal bleeding.

Lacario White had known Lovejoy about 15 years and Justice and Tharpe all his life. He had also known Gerard and Marcus Character about fifteen years and Roberts about three to five years. White went to the Poole Palace about midnight and left the club at closing with Tharpe, Justice, and Lovejoy, with Gates walking close behind them. As they were coming down the steps at the front of the club, the Characters and Roberts, along with numerous other people, were blocking their way at the bottom of the stairs. According to White, as Tharpe and Gerard were talking, Terry hit White, prompting Tharpe and White to hit Terry. In about 15 to 30 seconds, shooting started. White ducked, and then looked up and saw the Characters and Roberts lower guns they had in their hands and begin running. White testified Roberts had on a red, button-down shirt with a white t-shirt under it and was not far from Justice's body when White looked up.

Antonio Neason arrived at the Poole Palace about closing time on the night of the crimes. Neason was standing close enough to the two groups to hear them argue. He heard Lovejoy tell Gerard Character that he had a "beef" with Gerard because he had "robbed [him] of four thousand dollars." Shortly thereafter, Neason observed Terry hit White, and saw Gerard shoot Tharpe. Neason also saw Roberts running with a .40 caliber gun in his hand and saw Justice lying on the ground.

At the crime scene, police recovered shell casings from a .45 caliber handgun, .40 caliber handgun, and a 9mm handgun. Forensic evidence showed that the bullet recovered from Justice's body was a .40 caliber bullet and the bullet recovered from Lovejoy's body was fired from a 9mm handgun. In addition, the .45 caliber casings found at the crime scene were fired from the .45 caliber Astra handgun that Tharpe took from Gerard.

Having reviewed the evidence in the light most favorable to the verdicts, we conclude that a rational trier of fact could have found that Character and Roberts were parties to the crimes for which they were convicted and thus could have found them guilty beyond a reasonable doubt for those crimes.[2]

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); OCGA § 16-2-20.

## Case No. S08A2056. Character v. State.

2. Character contends that his right of confrontation, as set forth in *Crawford v. Washington*,[3] was violated when Tharpe testified about Lovejoy's prior confrontation with the Characters. This contention, however, is without merit, as Lovejoy's statement to Tharpe was not "testimonial" as the United States Supreme Court has defined that term and thus does not fall within the purview of the Confrontation Clause.[4]

Moreover, Character contends the statements were inadmissible under the necessity exception to the hearsay rule. The trial court admitted Tharpe's testimony regarding what Lovejoy had told him about the prior difficulty with the Characters on two grounds: (1) that it was not offered for the truth of the matter asserted and thus was not hearsay; and (2) that, even if it was hearsay, it was admissible under the necessity exception to the hearsay rule.

Lovejoy's out-of-court statements were non-hearsay and admissible as "original evidence" if the requirements of OCGA § 24-3-2 were satisfied.[5] This Court has interpreted that Code section to mean that, "[w]hen, in a legal investigation, the conduct and motives of the actor are matters concerning which the truth must be found . . . , then information, conversations, letters and replies, and similar evidence known to the actor are admissible to explain the actor's conduct."[6] This Court has expressly held in several criminal cases that a victim's conduct is not a matter "concerning which the truth must be found" and that the victim's out-of-court statements to a third party are thus not admissible to explain the victim's motives or conduct.[7] Similarly, we have held that a victim's out-of-court statements to a third party are not admissible to explain a defendant's conduct and motives under OCGA § 24-3-2 unless the defendant knew of those statements.[8] The reasoning of these latter cases is sound. The victim's statements about prior difficulties cannot serve to illustrate the defendant's conduct and motives unless (1) those statements are true; or (2) they are false, but the defendant knew

---

[3] 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004).

[4] *Davis v. Washington*, 547 U. S. 813, 822-828 (126 SC 2266, 165 LE2d 224) (2006); *Smith v. State*, 284 Ga. 304, 308 (667 SE2d 65) (2008); *Miller v. State*, 283 Ga. 412, 415, n. 9 (658 SE2d 765) (2008).

[5] *Slakman v. State*, 272 Ga. 662, 667 (533 SE2d 383) (2000); Paul S. Milich, Georgia Rules of Evidence § 17.3, p. 349 (2d ed. 2002).

[6] *Momon v. State*, 249 Ga. 865, 867 (294 SE2d 482) (1982); *Teague v. State*, 252 Ga. 534, 534-536 (314 SE2d 910) (1984); *Slakman*, 272 Ga. at 667; *Vega v. State*, 285 Ga. 32 (673 SE2d 223) (2009).

[7] *Slakman*, 272 Ga. at 667; *Dover v. State*, 250 Ga. 209, 212-213 (296 SE2d 710) (1982).

[8] *Slakman*, 272 Ga. at 667; *Jackson v. State*, 256 Ga. 536, 537-538 (350 SE2d 428) (1986); *Hooten v. State*, 256 Ga. 31, 33-34 (343 SE2d 481) (1986).

that the victim was telling people they were having difficulties. As was correctly stated in *Jackson*:

> For conversations to be admissible under OCGA § 24-3-2 and *Momon*, the conversations must be known to the actor. Then if and only if the actor's conduct or motives are relevant to issues being tried, those conversations upon which the actor acted are admissible. They are admissible because they represent original evidence to prove the very fact that such a conversation occurred, not its truth or falsity. . . . The witnesses in this case testified as to conversations they had with Ms. Jackson [the victim] that were unknown to the appellant. . . . Ms. Jackson's conversations with others regarding statements made by the appellant or actions taken by the appellant were not admissible to explain the appellant's motive or conduct under OCGA § 24-3-2 or *Momon*.[9]

*Perry v. State*,[10] however, reached a result that is contrary to the foregoing cases. It appears that *Perry* was a garden variety case involving prior difficulties in which the victim told her friends about the defendant's prior abuse of her. Relying on OCGA § 24-3-2, the Court concluded that the victim's out-of-court statements were admissible. Perry did not analyze whether the victim's statements were admissible to explain the victim's or the defendant's conduct or motives, but simply concluded that they were admissible to explain the "motive for the killing." It thus appears that we approved of the admission of the victim's statements in *Perry* on the ground that the defendant's conduct was a matter concerning which the truth had to be found and that the victim's statements were relevant to explain the defendant's conduct. It also appears, however, that the conversations the victim had in *Perry* with her friends were private and not shared with Perry. Thus, *Perry* is in conflict with the better-reasoned rationale of *Jackson* and *Slakman*. Moreover, the questionable reasoning of *Perry* is illustrated by the near universal reliance on the necessity exception to the hearsay rule to admit evidence of prior difficulties.[11] For these reasons, we overrule *Perry* to the extent it holds that a victim's conversations with a witness are admissible to explain the defendant's conduct under OCGA § 24-3-2 even if they

---

[9] *Jackson*, 256 Ga. at 538. Accord *Slakman*, 272 Ga. at 667.

[10] 255 Ga. 490, 493 (339 SE2d 922) (1986).

[11] See, e.g., *Cane v. State*, 285 Ga. 19 (673 SE2d 218) (2009); *Allen v. State*, 284 Ga. 310, 314 (667 SE2d 54) (2008); *Miller v. State*, 283 Ga. 412, 414 (658 SE2d 765) (2008); *Culmer v. State*, 282 Ga. 330, 331 (647 SE2d 30) (2007); *Williams v. State*, 277 Ga. 853, 855 (596 SE2d 597) (2004).

are unknown to the defendant. Moreover, to the extent *Perry* holds that the victim's conduct was a matter concerning which the truth had to be found and that the victim's statements were admissible to explain that conduct, it is overruled.

Even though Lovejoy's statements were not admissible under OCGA § 24-3-2, we conclude the trial court properly admitted them under the necessity exception to the hearsay rule. The record shows that Tharpe and Lovejoy were life-long friends who placed great confidence in each other and that Lovejoy confided in Tharpe in times of trouble. Lovejoy's out-of-court statements to Tharpe constituted some of the most probative evidence regarding the difficulty between Lovejoy and the defendants. For these reasons, the trial court did not abuse its discretion in concluding the statements were admissible under the necessity exception.[12]

Character also contends that Neason's testimony that he heard Lovejoy tell Character at the crime scene that Character had robbed Lovejoy of $4,000 violated his right of confrontation. However, for the same reasons as given for Tharpe's testimony about Lovejoy's out-of-court statements, Lovejoy's out-of-court statement at the crime scene was not testimonial in nature and Neason's testimony regarding it did not violate Character's right of confrontation.[13]

Character further contends that Neason's testimony about Lovejoy's out-of-court statement constituted inadmissible hearsay. We conclude, however, that Lovejoy's statement was admissible as "original evidence" under OCGA § 24-3-2. The statement was known to the "actor" (Character), as the statement was made in Character's presence, and was admissible to explain Character's motive and conduct.[14] Finally, even if not admissible under OCGA § 24-3-2, Neason's testimony was admissible under the res gestae exception to the hearsay rule.[15]

3. Character contends his right of confrontation was violated when a Fulton County Sheriff's Deputy testified that, after the shooting, people ran back into the club and said, "they killed him," and "[Character]" did it. Character, however, did not raise the confrontation objection at trial and thus is procedurally barred from raising the issue on appeal.[16]

4. Contrary to Character's contention, the trial court did not err in admitting evidence of Character's robbery of Lovejoy as prior

---

[12] *Miller*, 283 Ga. at 414-415.
[13] See n. 4, supra.
[14] See *Slakman*, 272 Ga. at 667; *Jackson*, 256 Ga. at 537-538.
[15] *Thomas v. State*, 284 Ga. 540, 543-544 (668 SE2d 711) (2008).
[16] *Purvis v. State*, 273 Ga. 898, 899 (548 SE2d 326) (2001).

difficulty evidence, as the evidence sheds light on the relationship between Character and the victim and was thus admissible.[17]

### *Case No. S08A2057. Roberts v. State.*

5. Roberts contends the trial court erred in denying his motion to sever his trial from that of his co-defendants. We disagree.

" 'The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process.' "[18] To satisfy the prejudice prong, Roberts contends that Marcus Character's girl-friend's testimony that Marcus told her Roberts was at the club that night was prejudicial and would not have been admissible in a separate trial. However, because numerous witnesses placed Roberts at the crime scene, Marcus's girlfriend's testimony does not consti-tute a clear showing of prejudice and a denial of due process and did not require severance.

Roberts also contends the prior difficulty evidence between Character and Lovejoy did not involve him, but nonetheless created an inference that Roberts had a motive to harm the victims when, in fact, he did not. We conclude, however, that, even if the trial court did not instruct the jury to limit its consideration of the prior difficulty evidence to Gerard and Marcus Character,[19] the refusal to sever was harmless considering the overwhelming evidence that Roberts par-ticipated as a party to the crimes in question.[20] For this same reason, we similarly conclude that any error in failing to give a proper limiting instruction was harmless.[21]

6. Roberts contends the trial court erred in allowing into evidence prior out-of-court statements of Tharpe and Neason that improperly bolstered their trial testimony.[22] Roberts, however, did

---

[17] *Smith*, 284 Ga. at 307; *Clark v. State*, 279 Ga. 243, 246 (611 SE2d 38) (2005).

[18] *Moss v. State*, 275 Ga. 96, 99 (561 SE2d 382) (2002) (quoting *Dennard v. State*, 263 Ga. 453, 455 (435 SE2d 26) (1993)). Accord *Metz v. State*, 284 Ga. 614 (669 SE2d 121) (2008).

[19] In its final charge to the jury, the trial court informed the jury that the evidence of prior difficulties between "the defendants Gerard and Marcus Character and [Lovejoy] has been admitted for the sole purpose of illustrating . . . the state of feeling between the defendants and [Lovejoy] and the bent of mind and course of conduct on the part of the defendants."

[20] See *Walker v. State*, 282 Ga. 703, 706 (653 SE2d 468) (2007) (defendant contended denial of motion to sever was error given that evidence of co-defendant's bad character was admitted and tainted him; even if error to deny motion to sever, error was harmless given overwhelming evidence of guilt).

[21] Id.

[22] See *Woodard v. State*, 269 Ga. 317, 318-320 (496 SE2d 896) (1998).

not raise this objection at trial with regard to Tharpe's testimony and is thus procedurally barred from raising the issue on appeal.[23]

Roberts, however, did object to the prosecutor's use of the prior consistent statement of Neason, and we conclude the trial court erred in permitting it.

> A witness's prior consistent statement is admissible only where: (1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination. A witness's veracity is placed in issue so as to permit the introduction of a prior consistent statement if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination.[24]

Morever, for the prior consistent statement to be considered relevant to rebut the charge of recent fabrication, improper influence, or improper motive, it must have been made " '*before* the motive or influence came into existence or *before* the time of the alleged recent fabrication.' "[25] "If the statement was made later, proof of the statement does not assist the jury to evaluate the witness's testimony because the reliability of the statement is subject to the same doubt as the trial testimony."[26] Finally, "the general test of admissibility is whether evidence of the . . . consistent statements is logically relevant to explain the impeaching fact."[27]

Our review of the record indicates defense counsel for all defendants asked numerous questions attacking Neason's general credibility regarding his testimony of the details of the night of the crime, such as whether he could recognize a .40 caliber handgun in the dark. Moreover, defense counsel also questioned Neason about a prior statement he gave to the police on February 19, 2002, that conflicted in one respect with his testimony on direct examination. On direct, Neason testified that only Tharpe and White attacked Terry, but on cross, Gerard's defense counsel pointed out that in the February 19, 2002, statement Neason stated he had hit Terry.

At the conclusion of the cross-examination, the trial court permitted the prosecutor to read Neason's February 19 statement in

---

[23] *Purvis*, 273 Ga. at 899.

[24] *Tuff v. State*, 278 Ga. 91, 94 (597 SE2d 328) (2004). Accord *Woodard v. State*, 269 Ga. at 320.

[25] *Woodard*, 269 Ga. at 320 (quoting M. Graham, Federal Practice & Procedure, § 6712 (1997)) (emphasis in original).

[26] McCormick on Evidence, Vol. 1, § 47, p. 226 (6th ed. 2006).

[27] McCormick § 47, p. 221.

its entirety to the jury. That statement was consistent with Neason's testimony at trial except as to whether he hit Terry.

We conclude that the trial court erred in permitting the prosecutor to read Neason's prior statement. First, our review of the defendants' cross-examinations of Neason reveals no *affirmative* charges of recent fabrication, improper influence, or improper motive that arose between the time of the February 19, 2002, statement and the time of trial. In fact, any improper motive or influence that Neason may have had because of his friendships with the victims existed both at the time of the February 19 statement and the trial. Moreover, the prior consistent statement was not "logically relevant to explain" any impeaching fact.[28] In particular, the consistent parts of the February 19 statement — e.g., that Neason saw Roberts running with a gun shortly after the shooting and identified his clothing — were not relevant to explain the inconsistency between his February 19 statement and his testimony regarding whether he hit Terry before the shooting started.

We also conclude, however, that the error was harmless. In making this determination, we may not rely on the fact that Neason gave testimony at trial that was consistent with the prior statement that should not have been introduced, as the very nature of the error in admitting the prior consistent statement "is that it is repetitive of that to which the witness has already testified."[29] However, several other witnesses gave testimony that was consistent with the majority of the content of Neason's prior statement. Moreover, the forensic evidence revealing that three guns were used in the crimes is consistent with the testimony of the other witnesses as to the involvement of three defendants in committing the crimes. In addition, on Neason's direct examination, two key points of Neason's prior statement — what Roberts was wearing and the type of gun he had — were introduced into evidence without objection. We thus conclude that the trial court's error in admitting Neason's prior statement was harmless.

7. Roberts contends trial counsel provided ineffective representation, but, because new counsel filed Roberts's motion for new trial and did not raise any issue of ineffectiveness of trial counsel, Roberts is procedurally barred from raising this issue on appeal.[30]

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 9, 2009.

---

[28] Id.

[29] *Baugh v. State*, 276 Ga. 736, 739 (585 SE2d 616) (2003).

[30] *Hendrix v. State*, 284 Ga. 420, 421 (667 SE2d 597) (2008).

*Zell & Zell, Rodney S. Zell*, for appellant (case no. S08A2056).

*Scott A. Drake*, for appellant (case no. S08A2057).

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Peggy R. Katz, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sara K. Sahni, Assistant Attorney General*, for appellee.